# *EXHIBIT "1"*

Case 1:24-cv-20690-JB   Document 1-1   Entered on FLSD Docket 02/22/2024   Page 2 of 62

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT OF
FLORIDA, IN AND FOR MIAMI-DADE
COUNTY, FLORIDA

QUOTESTORM HOLDINGS, LLC, a
Delaware limited liability company,

CIVIL DIVISION

CASE NO.

      Plaintiff,

vs.

PATRICK COOK, an individual, and
AFFLUENT ADS, LLC, a New
Jersey limited liability company, d/b/a
LEADNOMICS,

      Defendants,

                                         /

## <u>VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF</u>

COMES NOW the Plaintiff, QuoteStorm Holdings, LLC ("QuoteStorm"), by and through

undersigned counsel, and files this Verified Complaint for Damages and Injunctive Relief against the

Defendants Patrick Cook and Affluent Ads, LLC, d/b/a Leadnomics ("Leadnomics") and alleges as

follows:

## <u>PARTIES, JURISDITION AND VENUE</u>

1.      This is an action for injunctive relief and for damages in excess of $50,000.00,

exclusive of interest, attorneys' fees and costs.

2.      Plaintiff QuoteStorm is a Delaware limited liability company with its principal

place of business in Miami-Dade County, Florida.

3.      Defendant Patrick Cook ("Cook") is an individual who resides in California. Cook

was employed by QuoteStorm from January 2, 2023 through August 7, 2023.

4.     Defendant Leadnomics is a New Jersey limited liability company with its principal place of business in Philadelphia, Pennsylvania.  Leadnomics has engaged in substantial and not isolated activity within the State of Florida, has operated, conducted, engaged in and carried on a business or business venture in the State of Florida, has committed tortious acts in the State of Florida and has breached a contract in the State of Florida.

5.     Venue is proper in Miami-Dade County, Florida because the Employment Agreement between QuoteStorm and Cook at issue in this action provides for exclusive venue in Miami-Dade County, Florida and because the acts and omissions giving rise to the claims asserted herein occurred in Miami-Dade County, Florida.

## GENERAL ALLEGATIONS

6.     QuoteStorm is in the business of providing performance marketing services to insurance professionals interested in marketing and/or selling insurance products and services.  It purchases leads (which includes clicks, consumer-generated inbound calls and warm transfer calls) from vendors and in turn sells those leads to end user clients, typically insurance agents/brokers.

7.     On or about January 5, 2023, QuoteStorm entered into a Master Services Agreement with Leadnomics pursuant to which Leadnomics would sell leads/calls to QuoteStorm. A copy of the Master Services Agreement is attached as **Exhibit A.**

8.      On or about December 19, 2022, Cook was hired by QuoteStorm as Vice President of Partnerships (with a starting date of January 2, 2023). In this role, Cook was responsible for managing client and vendor relationships as well as new business development.

9.     As a condition of his employment, Cook executed an Employment Agreement, a

Page **2** of **24**

copy of which is attached as **Exhibit B.**

10.     Through his employment with QuoteStorm, Cook had access to all of QuoteStorm's business operations, including but not limited to, customer names and information, marketing plans, product development, intellectual property, client telephone numbers, client Skype and email addresses, vendor lists, contracts and agreements, customer accounts, pricing and rate structure data, customer purchasing histories and preferences, and proprietary methods, processes and strategies for purchasing and selling leads (collectively referred to as the "Confidential Information"). This Confidential Information included QuoteStorm's customer disposition records, from which it can be determined how leads purchased by QuoteStorm and sold to clients performed.

11.     The Employment Agreement contains a "Confidentiality" clause which prohibits Cook from disclosing to others or using any Confidential Information (as defined in the Employment Agreement). *See* Employment Agreement at par. 5(a)(i)(ii) and (iii). This clause also requires Cook to return to QuoteStorm all Confidential Information provided to him by QuoteStorm.

12.     The Employment Agreement contains a "Non-Competition" clause, which restricts Cook from competition for 2 years following his departure.  This clause prohibits Cook from working, in any capacity, or becoming employed by any competitor of QuoteStorm or participating in any business or other endeavor that is in competition with QuoteStorm.  *See* Employment Agreement at par. 5(b).

13.     The Employment Agreement contains a "Non-Solicitation" clause which prohibits Cook from soliciting or inducing, or attempting to solicit or induce, divert or take away the

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

business of any QuoteStorm client or otherwise attempt to cause any QuoteStorm client to refrain from acquiring any QuoteStorm product or service. *See* Employment Agreement at par. 5(c).

14.    The Employment Agreement contains a "Non-Solicitation of Employees" clause which prohibits Cook from, directly or indirectly, recruiting any QuoteStorm employee to discontinue his or her employment relationship with QuoteStorm, interfering with or attempting to disrupt any relationship between QuoteStorm and its employees, and soliciting or recruiting any employee for the purpose of being employed by any entity on whose behalf Cook is acting as an agent, representative or employee. *See* Employment Agreement at par. 5(c).

15.    Cook agreed that violation of the above-referenced provisions would cause irreparable harm to Quotestorm for which Quotestorm "shall be entitled to obtain from any court of competent jurisdiction immediate injunctive relief and obtain a temporary order restraining any threatened or further breach as well as an equitable accounting of all profits or benefits arising out of such violation." *See* Employment Agreement at par. 5(a)(i), 5(g).

16.    The restrictions on the use of Quotestorm's confidential information, on interfering with Quotestorm's business relationships and with working for QuoteStorm's clients and competitors were necessary due to Cook's intimate knowledge of QuoteStorm's business operations.

17.    As an employee of Quotestorm, Cook was provided with unfettered access to: 1) client and vendor lists and information, including sales, pricing and client purchase information and history; 2) custom A.I. analytics and proprietary strategies, methods and processes for obtaining leads from Quotestorm vendors, including Leadnomics; 3) pricing of the purchase of leads from Quotestorm vendors, including Leadnomics, 4) pricing on the sale of those leads to

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

QuoteStorm clients; 5) the specific preferences and needs of QuoteStorm clients in terms of leads; and 6) information on the performance of leads purchased from vendors, including Leadnomics, and the sale of those leads to QuoteStorm clients.

18.     Cook could use the foregoing knowledge and information to harm QuoteStorm by potentially causing QuoteStorm vendors or clients to reduce or eliminate their relationships with Quotestorm and, if Cook were to be employed or affiliated with a client or vendor, he could encourage that client or vendor to reduce or eliminate the relationship with QuoteStorm by causing vendors and clients to circumvent QuoteStorm as the "middleman" between vendor and client. As detailed below, that is exactly what happened.

19.     Subsequent to Cook's employment, in approximately May of 2023 QuoteStorm secured a new, large client, Enhance Health, an insurance brokerage that sells insurance products to individuals and entities.

20.     Almost immediately, Enhance Health began buying a significant number of leads from QuoteStorm, which leads QuoteStorm would purchase from Leadnomics. By June/July of 2023, QuoteStorm was purchasing from Leadnomics and selling to Enhance Health over 200 leads per day. As a result, Quotestorm's relationship with both Leadnomics and Enhance Health quickly became critically important and a major source of revenue for Quotestorm.

21.     Shortly thereafter, as business was ramping up significantly with Leadnomics and Enhance Health, Cook abruptly resigned from employment with QuoteStorm.

22.     Shortly after Cook's resignation, QuoteStorm noticed changes in the leads being made available from Leadnomics.  The quantity and quality of those leads began to decline appreciably in quality.  Additionally, the leads became more expensive as QuoteStorm was forced

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

to pay more for the same or even lower quality leads. Finally, one of QuoteStorm's clients, Insurance Line One, ceased doing business altogether with QuoteStorm approximately one week after Cook's resignation.

23. Upon information and belief, after resigning from Quotestorm, Cook - in direct violation of the non-compete - began working with Leadnomics. Thereafter, Cook took action to cause the change in leads being presented by Leadnomics to QuoteStorm as described above and, further, began soliciting clients and vendors of QuoteStorm, including but not limited to, Enhance Health, Insurance Line One and Jet Media, to directly sell leads to those clients. In so doing, Cook, directly or indirectly, disclosed to Leadnomics the identities and contact information of QuoteStorm's clients, along with other of QuoteStorm's Confidential Information (i.e., pricing and performance data) which is presently being used by Cook and Leadnomics to obtain a competitive advantage over QuoteStorm. Additionally, upon information and belief, Cook solicited and has worked with other Quotestorm vendors (such as IDS Group and We Generate) and has solicited employees to leave QuoteStorm all in violation of the Employment Agreement.

24. The use of QuoteStorm's Confidential Information by Leadnomics is prohibited by Paragraph 5(a) of the Master Services Agreement. In using Quotestorm's Confidential Information Leadnomics has violated the Master Services Agreement, for which Quotestorm is entitled to injunctive relief pursuant to Paragraph 5(b) of the Master Services Agreement.

25. As a result of Cook's actions in violation of the Employment Agreement, and Leadnomics violation of the Master Services Agreement, QuoteStorm has lost a significant volume of business and suffered substantial financial damage.

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

## COUNT I – INJUNCTIVE RELIEF TO ENFORCE COVENANTS NOT TO COMPETE AND FOR NON-SOLICITATION PURSUANT TO SEC.542.335, FLORIDA STATUTES AS TO COOK

26.     Plaintiff re-states and incorporates paragraphs 1 to 25 above, as if stated herein in full.

27.     This is an action by QuoteStorm against Cook for preliminary and permanent injunctive relief to enjoin Cook from continued violation of the non-compete and non-solicitation provisions of his Employment Agreement.

28.     Cook executed the Employment Agreement as consideration for employment by QuoteStorm.  The Employment Agreement contains a "Non-Competition" clause, which restricts Cook from competition for 2 years following his departure (unless terminated by QuoteStorm without cause).  This clause prohibits Cook from working, in any capacity, or becoming employed by any competitor of QuoteStorm or participating in any business or other endeavor that is in competition with QuoteStorm.

29.     Cook's Employment Agreement contains a "Non-Solicitation" clause which prohibits Cook from soliciting or inducing, or attempting to solicit or induce, divert or take away the business of any QuoteStorm client or otherwise attempt to cause any QuoteStorm client to refrain from acquiring any Quotestrom product or service.

30.     The Employment Agreement contains a "Confidentiality" clause which prohibits Cook from disclosing to others or using any of QuoteStorm's Confidential Information (as defined in the Employment Agreement). *See* Employment Agreement at par. 5(a)(i)(ii) and (iii).

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

31.     In exchange for agreeing to the restrictions, Cook was hired by QuoteStorm and continued to be employed by QuoteStorm.

32.     The foregoing restrictions are necessary, reasonable and supported by adequate consideration.

33. The Employment Agreement contemplates the protection of QuoteStorm's legitimate business interests, including but not limited to, QuoteStorm's client and vendor lists and information, including sales, pricing and purchase information and histories; strategies, methods and processes for obtaining leads from QuoteStorm vendors, including Leadnomics; pricing of the purchase of leads from QuoteStorm vendors, including Leadnomics, pricing on the sale of those leads to QuoteStorm clients, including Enhance Health;  the specific preferences and needs of QuoteStorm clients in terms of leads, including Enhance Health, information on the performance of leads purchased from vendors, including Leadnomics, and the sale of those leads to QuoteStorm clients, including Enhance Health.

34.     QuoteStorm's has legitimate business interests in these areas, which constitute QuoteStorm's protected trade secrets.

35.     Each of the foregoing restrictions contained in the Employment Agreement are reasonable and necessary to protect QuoteStorm's legitimate business interests, including its Confidential Information and substantial relationships with vendors and clients.

36.     Following his resignation from Quotestorm, Cook began working Leadnomics. Cook's employment with Leadnomics is in direct violation of the non-compete, non-solicitation and confidentiality provisions of the Employment Agreement.

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

37.     On information and belief, following Cook's employment with Leadnomics, Leadnomics is now selling leads directly to QuoteStorm's clients, including Enhance Health and others.  All such sales are inevitably informed by – and therefore inevitably made using and disclosing – QuoteStorm's Confidential Information. Cook has violated the confidentiality provision of the Employment Agreement by using information gained as a result of his employment with QuoteStorm to benefit Leadnomics, a competitor selling directly to QuoteStorm's client(s).

38.     In the Employment Agreement, Cook acknowledged and agreed that QuoteStorm's Confidential Information "is of great competitive importance and commercial value to the Company, and that improper use or disclosure of the Confidential Information will cause irreparable harm to the Company, for which remedies at law will not be adequate." *See* Employment Agreement at 5 (a)(i). Additionally, Cook agreed that QuoteStorm is entitled to an equitable accounting of all profits or benefits arising from any violation of the restrictive covenants contained in the Employment Agreement. *See* Employment Agreement at 5 (g). QuoteStorm is entitled to temporary and permanent injunctive relief pursuant to the terms of the Employment Agreement and Florida common law to prevent continuing and future irreparable harm by Cook.

39.     Based on the clear, unambiguous terms of the Employment Agreement, QuoteStorm has a clear legal right to an injunction.

40.     As a result of the irreparable injury and harm detailed above, QuoteStorm lacks an adequate remedy at law.

41.     Having a vested interest in ensuring the sanctity of contracts, entering the requested injunction will serve the public interest.

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

42.     QuoteStorm has a substantial likelihood of success on the merits of this cause.

43.     Unless Cook and those who are in active concert or participation with him are enjoyed against violation of the Employment Agreement, QuoteStorm will suffer irreparable harm in the form of, among other things, 1) use and/or disclosure of Confidential Information, financial information and other confidential and proprietary information that is the property QuoteStorm; 2) present economic loss, which is unascertainable at this time, and future economic loss, which is incalculable; and 3) loss of customer goodwill, damage to customer relationships, loss of market position and reputation in the industry and damage to its valuable competitive advantage – all of which cannot be compensated by an award of damages.

WHEREFORE, QuoteStorm requests that this Court enter judgment:

a)    Temporarily and permanently enjoining Cook, and all those acting in active concert or participation with him in violation of his Employment Agreement, from the following:

1)   Directly or indirectly competing with QuoteStorm;

2)   Using or disclosing QuoteStorm's Confidential Information;

3)   Directly or indirectly selling leads to Enhance Health, Insurance Line One, Jet Media and any other of QuoteStorm's clients;

4)   Directly or indirectly soliciting QuoteStorm's clients or vendors;

5)   Directly or indirectly soliciting QuoteStorm's employees;

6)   Requiring Cook to return all documents or materials containing QuoteStorm's Confidential Information;

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

7) Requiring the return of QuoteStorm's Confidential Information from all those persons/entities to whom Cook has provided such information including, but not limited to, Leadnomics;

8) Ordering an equitable accounting of all revenue, profits or benefits arising from Cook's breaches of the Employment Agreement;

9) Awarding QuotesStorm its attorneys' fees and costs pursuant to the Employment Agreement and Florida Statutes; and

10) Granting such other relief as the Court deems appropriate.

## COUNT II –BREACH OF CONTRACT AS TO COOK

44.   QuoteStorm re-states and incorporates paragraphs 1 to 25 above, as if stated herein in full.

45.    This is an action by QuoteStorm against Cook for breach of the Employment Agreement.

46.   Cook executed the Employment Agreement as consideration for employment by QuoteStorm.  The Employment Agreement contains a "Non-Competition" clause, which restricts Cook from competition for 2 years following his departure (unless terminated by QuoteStorm without cause).  This clause prohibits Cook from working, in any capacity, or becoming employed by any competitor of QuoteStorm or participating in any business or other endeavor that is in competition with QuoteStorm.

47.   Cook's Employment Agreement contains a "Non-Solicitation" clause which prohibits Cook from soliciting or inducing, or attempting to solicit or induce, divert or take away

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

the business of any QuoteStorm client or otherwise attempt to cause any QuoteStorm client to refrain from acquiring any Quotestrom product or service.

48.     The Employment Agreement contains a "Confidentiality" clause which prohibits Cook from disclosing to others or using any Confidential Information (as defined in the Employment Agreement). *See* Employment Agreement at par. 5(a)(i)(ii) and (iii).

49.     In exchange for agreeing to the restrictions, Cook was hired by QuoteStorm and continued to be employed by QuoteStorm.

50.     Cook has breached the non-compete provision of the Employment Agreement by working with Leadnomics, who is in direct competition with QuoteStorm.

51.     Cook has breached the non-solicitation provisions of the Employment Agreement by soliciting QuoteStorm clients and vendors, including but not limited to Enhance Health, Jet Media, Insurance Line One and others, and by causing Leadnomics to refrain from doing business with QuoteStorm. Cook has further breached the non-solicitation provisions of the Employment Agreement by soliciting QuoteStorm employees.

52.     Cook has breached the confidentiality provisions of the Employment Agreement by disclosing and using QuoteStorm's Confidential Information for his own benefit and for the benefit of Leadnomics and others.

53.     As a result of Cook's breaches of the Employment Agreement, QuoteStorm has suffered damages.

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

WHEREFORE, QuoteStorm requests that this Court enter judgment in favor of QuoteStorm, award attorneys' fees and costs pursuant to the Employment Agreement and grant such other relief as the Court deems appropriate.

### COUNT III – INJUNCTIVE RELIEF – MISAPPROPRIATION OF TRADE SECRETS PURSUANT TO SEC.688.001, FLORIDA STATUTES AS TO COOK AND LEADNOMICS

54. Plaintiff re-states and incorporates paragraphs 1 to 25 above, as if stated herein in full.

55. This is an action against Cook and Leadnomics for preliminary and permanent injunctive relief to enjoin Cook and Leadnomics' misappropriation of trade secrets pursuant to Section 688.003, Florida Statutes.

56. QuoteStorm's client and vendor lists and information, including sales, pricing and purchase information and histories; proprietary strategies, methods and processes for obtaining leads from QuoteStorm vendors; pricing of the purchase of leads from QuoteStorm vendors, pricing on the sale of those leads to QuoteStorm clients, client distribution reports and other data were developed over a long period of time and were developed at great expense and time.

57. The foregoing constitutes QuoteStorm trade secrets and QuoteStorm has taken all reasonable steps to protect and maintain these trade secrets.

58. Cook had access to the trade secrets only by virtue of his employment with QuoteStorm and was obligated to maintain this information as confidential.

59. The Employment Agreement contains a "Confidentiality" clause which prohibits Cook from disclosing to others or using QuoteStorm's trade secrets.

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

60.    The Master Services Agreement contains a "Confidentiality" provision which prohibits the use of QuoteStorm's trade secrets by Leadnomics and entitles QuotesStorm to injunctive relief for a violation of this provision.

61.    Cook has taken, used and disclosed to Leadnomics  QuoteStorm's trade secrets and Leadnomics has used those trade secrets to obtain an unfair competitive advantage over QuoteStorm.  The circumstances are such that Leadnomics knew or should have known this to be the case.

62.    Upon information and belief, Leadnomics has encouraged and enticed Cook (and possibly other QuoteStorm employees) to misappropriate QuoteStorm's trade secrets.

63.    The use and disclosure of QuoteStorm's trade secrets was unlawfully done without the consent of QuoteStorm in direct violation of Florida Statues, Sec. 688.01, et. seq.

64.    QuoteStorm has and will continue to suffer irreparable harm as a direct and proximate result of Cook and Leadnomics' unlawful and unauthorized misappropriation of QuoteStorm's trade secrets.

65.    The use by Cook and Leadnomics of QuoteStorm's trade secrets constitutes a continuing harm entitling QuoteStorm to injunctive relief.

66.    QuoteStorm has no adequate remedy at law.

67.    QuoteStorm has a substantial likelihood of success on the merits of this action.

68.    A permanent injunction will serve the public interest.

WHEREFORE, QuoteStorm demand judgment against Cook and Leadnomics for:

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

b) The issuance of a temporary injunction enjoining Cook, Leadnomics and all those acting in active concert or participation with them from misappropriating, using or disclosing QuoteStorm's trade secrets in violation of Section 688.001, *et. seq.* Fla. Stat.;

c) The issuance of a permanent injunction enjoining Cook, Leadnomics and all those acting in active concert or participation with them from misappropriating, using or disclosing QuoteStorm's trade secrets in violation of Section 688.001, *et. seq.* Fla. Stat.;

d) An award of attorneys' fees and costs pursuant to Section 688.001, *et. seq.* Fla. Stat., pursuant to the Employment Agreement and pursuant to the Master Services Agreement;

e) An accounting of Leadnomics profits and an amount equal to any such profits realized by Defendants as a result of the misappropriation of QuoteStorm's trade secrets.

f) Such other relief as the Court deems appropriate.

## COUNT IV – DAMAGES – MISAPPROPRIATION OF TRADE SECRETS PURSUANT TO SEC.688.001, FLORIDA STATUTES AS TO COOK AND LEADNOMICS

69. Plaintiff re-states and incorporates paragraphs 1 to 25 and 54-59 above, as if stated herein in full.

70. The acquisition and use of QuoteStorm's trade secrets was done unlawfully and without the consent of QuoteStorm in violation of Section 688.001, *et. seq.* Fla. Stat.

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

71.     QuoteStorm has suffered damages as a direct and proximate result of Cook and Leadnomics' misappropriation of QuoteStorm's trade secrets.

72.     The misappropriation and use by Cook and Leadnomics of QuoteStorm's trade secrets was willfull and malicious entitling QuoteStorm to exemplary damages and punitive damages which will be sought as required by Section 768.72, Florida Statutes.

WHEREFORE, QuoteStorm requests that this Court enter judgment for damages in favor of QuoteStorm, award attorneys' fees and costs pursuant Sec. 688.005, Florida Statutes, and grant such other relief as the Court deems appropriate.

## <u>COUNT V –BREACH OF CONTRACT AS TO LEADNOMICS</u>

73.     QuoteStorm re-states and incorporates paragraphs 1 to 25 above, as if stated herein in full.

74.     This is an action by QuoteStorm against Leadnomics for breach of the Master Services Agreement.

75.     QuoteStorm and Leadnomics are parties to a Master Services Agreement.  The Master Services Agreement contains a "Confidentiality" provision which prohibits the use of QuoteStorm's Confidential Information by Leadnomics.

76.     Leadnomics has breached the Master Services Agreement by using QuoteStorm's Confidential Information.

77.     More specifically, Leadnomics has used QuoteStorm's Confidential Information - which it obtained though business dealings with QuoteStorm and from its wrongful employment of Cook in violation of Cook's Employment Agreement - to sell leads directly to QuoteStorm's

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

clients including but not limited to, Enhance Health.

78.     As a result of Leadnomics' breach of the Master Services Agreement, QuoteStorm has suffered damages.

WHEREFORE, QuoteStorm requests that this Court enter judgment in favor of QuoteStorm, award attorneys' fees and costs pursuant to the Master Services Agreement and grant such other relief as the Court deems appropriate.

## COUNT VI –INJUNCTIVE RELIEF AS TO LEADNOMICS

79.     QuoteStorm re-states and incorporates paragraphs 1 to 25 above, as if stated herein in full.

80.     This is an action by QuoteStorm against Leadnomics for injunctive relief pursuant to the Master Services Agreement.

81.     QuoteStorm and Leadnomics are parties to a Master Services Agreement.  The Master Services Agreement contains a "Confidentiality" provision which prohibits the use of QuoteStorm's Confidential Information by Leadnomics.

82.     Leadnomics has breached the Master Services Agreement by using QuoteStorm's Confidential Information.

83.     More specifically, Leadnomics has used QuoteStorm's Confidential Information - which it obtained though business dealings with QuoteStorm and from its wrongful employment of Cook in violation of Cook's Employment Agreement - to sell leads directly to QuoteStorm's clients including but not limited to, Enhance Health.

84.     Paragraph 5(b) of the Master Services Agreement provides that "[b]reach of

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

confidentiality may cause irreparable harm and therefore, in addition to all other remedies available at law or in equity, the injured party shall have the right to seek equitable and injunctive relief, without the need to post a bond…."

85.     As a result of Leadnomics' breach of the Master Services Agreement, QuoteStorm has and will continue to suffer irreparable harm for which it has no adequate remedy at law.

86.     QuoteStorm has a substantial likelihood of success on the merits and an injunction will serve the public interest.

WHEREFORE, QuoteStorm demand judgment against Cook and Leadnomics for:

a) The issuance of a temporary injunction enjoining Leadnomics and all those acting in active concert or participation with them, from using or disclosing QuoteStorm's Confidential Information;

b) The issuance of a permanent injunction enjoining Leadnomics and all those acting in active concert or participation with them, from using or disclosing QuoteStorm's Confidential Information;

c) An award of attorneys' fees and costs pursuant to the Master Services Agreement;

d) An accounting of Leadnomics profits and an amount equal to any such profits realized  as a result of the unauthorized use of QuoteStorm's Confidential Information;

e) Such other relief as the Court deems appropriate.

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

## COUNT VII – INJUNCTIVE RELIEF – MISAPPROPRIATION OF TRADE SECRETS PURSUANT TO TITLE 6 DE CODE, SEC. 2002 AS TO LEADNOMICS

84.     Plaintiff re-states and incorporates paragraphs 1 to 25 above, as if stated herein in full.

85.     This is an action against Leadnomics for preliminary and permanent injunctive relief to enjoin Leadnomics' misappropriation of trade secrets pursuant to Title 6 DE Code, Sec. 2002.

86.     QuoteStorm's client and vendor lists and information, including sales, pricing and purchase information and histories; proprietary strategies, methods and processes for obtaining leads from QuoteStorm vendors; pricing of the purchase of leads from QuoteStorm vendors, pricing on the sale of those leads to QuoteStorm clients, client distribution reports and other data were developed over a long period of time and were developed at great expense and time.

87.     The foregoing constitutes QuoteStorm trade secrets and QuoteStorm has taken all reasonable steps to protect and maintain these trade secrets.

88.     Cook had access to the trade secrets only by virtue of his employment with QuoteStorm and was obligated to maintain this information as confidential.

89.     The Employment Agreement contains a "Confidentiality" clause which prohibits Cook from disclosing to others or using QuoteStorm's trade secrets.

90.     The Master Services Agreement contains a "Confidentiality" provision which prohibits the use of QuoteStorm's trade secrets by Leadnomics and entitles QuotesStorm to injunctive relief for a violation of this provision.

91.     Cook has taken, used and disclosed to Leadnomics, QuoteStorm's trade secrets.

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

Leadnomics has used those trade secrets to obtain an unfair competitive advantage over QuoteStorm. The circumstances are such that Leadnomics knew or should have known this to be the case.

92.     Upon information and belief, Leadnomics has encouraged and enticed Cook (and possibly other QuoteStorm employees) to misappropriate QuoteStorm's trade secrets.

93.     The use and disclosure of QuoteStorm's trade secrets by Leadnomics was unlawfully done without the consent of QuoteStorm.

94.     QuoteStorm has and will continue to suffer irreparable harm as a direct and proximate result Leadnomics' unlawful and unauthorized misappropriation of QuoteStorm's trade secrets.

95.     The use by Leadnomics of QuoteStorm's trade secrets constitutes a continuing harm entitling QuoteStorm to injunctive relief.

96.     QuoteStorm has no adequate remedy at law.

97.     QuoteStorm has a substantial likelihood of success on the merits of this action.

98.     A permanent injunction will serve the public interest.

WHEREFORE, QuoteStorm demand judgment against Leadnomics for:

a) The issuance of a temporary injunction enjoining Leadnomics and all those acting in active concert or participation with them from misappropriating, using or disclosing QuoteStorm's trade secrets in violation of Title 6 DE Code, Sec. 2002;

b) The issuance of a permanent injunction enjoining Leadnomics and all those acting

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

in active concert or participation with them from misappropriating, using or disclosing QuoteStorm's trade secrets in violation of Title 6 DE Code, Sec. 2002;

c) An award of attorneys' fees and costs pursuant to Title 6 DE Code, Sec. 2004 and pursuant to the Master Services Agreement;

d) An accounting of Leadnomics profits and an amount equal to any such profits realized by Defendants as a result of the misappropriation of QuoteStorm's trade secrets;

e) Such other relief as the Court deems appropriate.

## COUNT VIII – DAMAGES – MISAPPROPRIATION OF TRADE SECRETS PURSUANT TO TITLE 6 DE CODE, SEC. 2003 AS TO LEADNOMICS

99. Plaintiff re-states and incorporates paragraphs 1 to 25 and 80-87 above, as if stated herein in full.

100. The acquisition and use of QuoteStorm's trade secrets was done unlawfully and without the consent of QuoteStorm.

101. QuoteStorm has suffered damages as a direct and proximate result of Leadnomics' misappropriation of QuoteStorm's trade secrets.

102. The misappropriation and use by Cook and Leadnomics of QuoteStorm's trade secrets was willfull and malicious entitling QuoteStorm to exemplary damages which will be sought under 6 DE Code Sec. 2003.

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

WHEREFORE, QuoteStorm requests that this Court enter judgment for damages in favor of QuoteStorm, award attorneys' fees and costs pursuant 6 DE Code, Sec. 2004, and grant such other relief as the Court deems appropriate.

### COUNT IX –TORTIOUS INTERFERENCE WITH A BUSINESS/CONTRACTUAL RELATIONSHIP AS TO COOK

103.    QuoteStorm re-states and incorporates paragraphs 1 to 25 above, as if stated herein in full.

104.    This is an action by QuoteStorm against Cook for tortious interference with a business/contractural relationship.

105.    QuoteStorm had existing business/contractual relationships with its vendors and clients, including Leadnomics and Enhance Health.

106.    QuoteStorm also had additional protections in place against solicitation of clients and vendors of QuoteStorm's vendors and clients in the Employment Agreement,

107.    Cook had knowledge of QuoteStorm's business/contractual relationships with Leadnomics and Enhance Heath.

108.    Cook intentionally and unjustifiably interfered with QuoteStorm's relationships with its vendors and clients, including but not limited to Leadnomics, Enhance Health, Jet Media, Insurance Line One and others.

109.    Cook's interference was done with malice.

110.    As a direct and proximate result of Cook's wrongful interference, QuoteStorm has suffered damages.

Page **22** of **24**

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

WHEREFORE, QuoteStorm requests that this Court enter judgment in favor of QuoteStorm and against Cook, award attorneys' fees and costs pursuant to the Employment Agreement and grant such other relief as the Court deems appropriate.

## COUNT X –TORTIOUS INTERFERENCE WITH A BUSINESS/CONTRACTUAL RELATIONSHIP AS TO LEADNOMICS

105.    QuoteStorm re-states and incorporate paragraphs 1 to 25 above, as if stated herein in full.

106.    This is an action by QuoteStorm against Leadnomics for tortious interference with a business/contractual relationship.

107.    QuoteStorm had existing business/contractual relationships with its clients, including Enhance Health.

108.    Leadnomics had knowledge of QuoteStorm's business/contractual relationships with its clients, including Enhance Heath and others.

109.    Leadnomics intentionally and unjustifiably interfered with QuoteStorm's relationship with Enhance Health (and other QuoteStorm clients), which interference has caused a reduction in the business between QuoteStorm and Enhance Health and other QuoteStorm clients.

110.    Leadnomics' interference was done with malice.

111.    As a direct and proximate result of the wrongful interference, QuoteStorm has suffered damages.

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

WHEREFORE, QuoteStorm requests that this Court enter judgment in favor of QuoteStorm and against Leadnomics, award attorneys' fees and costs pursuant to the Master Services Agreement and grant such other relief as the Court deems appropriate.

## VERIFICATION

I have read the foregoing and state that the facts alleged herein are true and correct to the best of my knowledge and belief.

Juan Carlos Redero, on behalf of QuoteStorm

**BALES SOMMERS & KLEIN, P.A.**
*Counsel for Plaintiff*
2 S. Biscayne Boulevard, Suite 1881
Miami, Florida 33131
Telephone:    305-372-1200
Facsimile:    305-372-9008
E-mail: jklein@bsklawyers.com

By:    *s/Jason Klein*
    Jason Klein
    Florida Bar No.: 0129097

Page 24 of 24



## MASTER SERVICES AGREEMENT

**THIS MASTER SERVICES AGREEMENT ("MSA")** is dated January 5, 2023, by and between Quote Storm Holdings, LLC ("QUOTESTORM"), a Delaware Limited Liability Company, and, and its Affiliates, and Affluent Ads, LLC, located at 2093 Philadelphia Pike #1072, Claymont, DE 19703 ("COMPANY"), each or together known as "Party" or "Parties";

### RECITALS

A. **WHEREAS**, COMPANY is in the business of (a) providing performance marketing services to insurance professionals interested in marketing and/or selling insurance products and services,

B. **WHEREAS**, QUOTESTORM markets, sells, or represents entities that market or sell certain insurance products and services listed on the insertion order(s) (IO(s)), which shall be incorporated herein by reference;

C. **WHEREAS**, the Parties desire to establish a non-exclusive relationship where COMPANY will refer users to QUOTESTORM, and QUOTESTORM will compensate COMPANY for such referred Leads, subject to the terms and conditions set forth in this Agreement;

D. **NOW, THEREFORE**, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties, intending to be legally bound, agree as follows:

### 1. Definitions
Any term not otherwise defined herein shall have the meaning specified below:

"Advertisement" means, without limitation, marketing materials, advertising collateral, links, request forms, banners, e-mails, headlines, creative, logos, text or images placed on a website, included within an e-mail, text message, and/or other marketing related media that may link to a website owned and operated by COMPANY.

"Applicable Laws, Rules, and Regulations" shall mean all applicable federal, state and local laws, statutes, rules, regulations and policies relating to online and direct marketing, telemarketing, lead generation and advertising including the Gramm-Leach Bliley Act, the Federal Trade Commission Act, Fair Credit Reporting Act, the Fair Debt Collection Practices Act, Telephone Consumer Protection Act, 47 USC 227 and 47 CFR 64.200, as amended from time to time ("TCPA"), Do Not Call Implementation Act, Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM"), Telemarketing Sales Rule ("TSR"), California Business & Professions Code § 17529, California Consumer Privacy Act of 2018 ("CCPA"), Florida SB 1120 ("Florida Mini-TCPA"), the Florida Do Not Call Act, Federal Trade Commission ("FTC") rules, regulations and opinions, and applicable privacy and data protection laws, rules and regulations, as such acts, laws, rules, regulations and/or opinions may be amended, modified or supplemented from time to time.

"Downstream Partners" shall mean those businesses that QUOTESSTORM may sell leads to, including, but not limited to Agents, Carriers, and Other Lead Providers.

"Call" shall mean the telephone call provided to the COMPANY under the terms and conditions set forth in applicable IO(s) for any inbound call or warm transfer program.





"Click" means the process of a website visitor clicking on a link that corresponds and directs a Consumer to Client's owned and operated website and/or Advertisement. Clicks may or may not include Lead Data.

"Consumer" means an individual who, without limitation, requests or responds to information for goods or services via, without limitation, a Request Form, telephone call or a Click.

"Invalid Lead(s)" means (i) any lead or call which did not meet the filtering criteria set forth in the applicable IO(s) but was otherwise erroneously transferred or made available to QUOTESTORM; (ii) Leads with incorrect or missing phone information; (iii) duplicate entries or other clear and meaningful errors; (iv) a computer-generated user, including, without limitation, through the use of any spyware, adware, device, program, robot, redirects, spiders, computer script or other automated, artificial, or fraudulent methods designed to appear like an individual, live person; (v) a Lead that was not submitted by the Consumer in real-time; and/or (vi) any lead that may have been incentivized.

"Lead Data" means the non-public, personally identifiable information obtained from a Consumer who, without limitation, submits a Request Form.

"Lead" means the Lead Data as provided to COMPANY under the terms and conditions set forth in applicable IO(s) for any lead data program.

"Link" means a facility appearing on a website, mobile text message or email that corresponds and directs a Consumer to Client's owned and operated website and/or Advertisement.

"Prohibited Content" means content that (i) infringes upon the personal rights, intellectual property rights, or copyrights of any person or entity; offer incentives to users to click on an advertisement, with incentives including, without limitation, rewards or gifts of cash, points, prizes, "free" items, or contest entries; contains or promotes obscenity, obscene language, pornography, violence, firearms, defamation, racially discriminating or hate speech, illegal activities including but not limited to the promotion of gambling, illegal substances, software piracy, or hacking; is not written in English; contain material that is defamatory or libelous; or which a reasonable person would find highly objectionable and/or (ii) contains viruses, worms, Trojan horses, malware, or other potentially destructive computer programs"

"Request Form" means a form completed by a Consumer expressing interest in third-party products/services.

"Valid Lead" means a Lead submitted by a Consumer on his or her own behalf, that (i) passes successfully through COMPANY's internal validity checks; (ii) came from a unique User; (iii) was generated, successfully delivered to and accepted by QUOTESTORM as a purchased Lead; and (iv) does not include Leads that are generated by fraudulent means.

2. **Ownership and License.**
QUOTESTORM acknowledges and agrees that all programs, websites and software used by COMPANY constitute trade secrets and/or copyrighted material of COMPANY.

3. **Compensation.** QUOTESTORM shall pay COMPANY under the schedule detailed in the IO(s), which may include dynamic ping/post pricing. QUOTESTORM will provide Company real-time or daily reporting for all activity, including pixel or post-back data. This pricing found in the IO is made part of this agreement. QUOTESTORM will pay all amounts earned by Company within 30 days from the end of each month, or as otherwise agreed, whichever is sooner. The compensation payable to Company shall be based upon the greater of either the revenue actually generated by the leads by, or as reported by the QUOTESTORM's tracking system. A change to pricing may only be made upon executing a subsequent IO or by email, with both parties electronic written consent. Any disputed bill shall be settled in good faith between the Parties. QUOTESTORM shall be responsible for paying all sales, tax, use, excise and other taxes and duties related

Doc ID: bc06ff1ef94b8c50ebd82482a29aa2717080fb19



to the lead compensation payable to Company, excluding taxes on Company's net income. Any past due

amounts, or portion thereof, not made when due shall accrue interest at the lesser of the maximum rate permitted by applicable law or three percent (3%) per month.

4. **Returns.** QUOTESTORM may submit leads that it determines in its commercially reasonable discretion are invalid lead(s). QUOTESTORM shall concurrently support all refund requests regarding purportedly Invalid Leads with justification for the dispute. If QUOTESTORM fails to notify Company of an Invalid Lead or provide the requisite supporting information prior to 5pm on the 10th day of the month following the month in which the lead was purchased, then any Invalid Lead will be deemed a Valid under this Agreement. Despite this timeline, QUOTESTORM will use commercially reasonable efforts to immediately notify Company of any suspected Invalid Leads.

### 5. Confidentiality and Cooperation.

a. "Confidential Information" means any information which is marked as "confidential," or should be reasonably understood by its nature or the circumstances of its disclosure to be confidential or proprietary to a Party, and is not generally available to the public, already known to the receiving Party or subsequently independently developed or received by the receiving Party without reference to the Confidential Information of the disclosing Party. During the Term of this Agreement and thereafter, with respect to the other Party's Confidential Information, each Party agrees (i) to keep it strictly confidential, (ii) to protect it as such Party protects its own Confidential Information but with not less than a reasonable degree of care, (iii) not to use it except as required to perform or receive the services contemplated by this Agreement, and (iv) not to disclose it to anyone other than such Party's employees who need to know it in order to perform or receive the services contemplated by this Agreement and are informed of its confidential nature. Each Party shall be responsible for any unauthorized disclosure or use by its employees of the other Party's Confidential Information. Neither Party shall be prohibited from disclosing the other Party's Confidential Information to the extent required by law, regulation, or judicial order, provided that the receiving Party shall (unless prohibited by law) first notify the disclosing Party and cooperate with the disclosing Party to obtain the maximum confidentiality or protective treatment possible and shall otherwise continue to protect such Confidential Information as provided in this Section 8. Upon the request of the disclosing Party, the receiving Party shall promptly return to the disclosing Party or destroy (and certify such destruction upon request) the disclosing Party's Confidential Information which is the possession or under the control of the receiving Party, including any copies, extracts, descriptions and summaries thereof, provided, however, that nothing herein shall require a Party to delete or purge any records in backup or archival systems kept in the normal course of business. Any material containing Confidential Information of the other Party that is not returned or destroyed shall remain subject to the confidentiality obligations set forth in this Agreement.

b. Breach of confidentiality may cause irreparable damage and therefore, in addition to all other remedies available at law or in equity, the injured Party shall have the right to seek equitable and injunctive relief, without the need to post a bond, and to recover the amount of damages (including reasonable attorneys' fees and expenses) incurred in connection with such unauthorized use or disclosure.

Doc ID: bc06ff1ef94b8c50ebd82482a29aa2717080fb19



**c.** The Lead Data and terms of this Agreement and of each IO entered into hereunder are Confidential Information of both Parties, provided QUOTESTORM has compensated Company for such Lead Data. All information regarding the performance of QUOTESTORM's leads and/or calls is Confidential Information of QUOTESTORM.

d. QUOTESTORM agrees and acknowledges that Company has proprietary relationships with publishers, Sub-Publishers, advertisers, aggregators, lead suppliers and buyers, Internet property owners and other partners (collectively, "Partners") that participate in Company's network or provide services to Company relating to Internet marketing and further agrees and acknowledges to cooperate fully with Company's relationships with its Partners and ensure that such relationships remain uninterrupted. During the term of the Agreement and for a period of one (1) year after any expiration or termination hereof, neither QUOTESTORM nor any affiliated entity, shall, directly or with malice_attempt to circumvent Company's proprietary relationships. However, Company recognizes that QUOTESTORM has a long history in the lead industry with many relationships. Furthermore, QUOTESTORM attends all major conferences and actively markets new publishers, Sub-Publishers, advertisers, aggregators, lead suppliers and buyers. In doing so, it is possible, even likely that QUOTESTROM may unknowingly circumvent publisher's relationships. For abundance of clarity, such an indirect circumvention does not violate this clause.

**6. Term and Termination** The term of this Agreement shall be for a period of 12 months from the execution date and shall automatically renew for successive 12-month terms. This Agreement may be terminated at any time by either party by providing the other party 48 business hours written notice of such termination. Notwithstanding the foregoing, either party may terminate this Agreement immediately, in addition to any other remedy, if the other party breaches a material term of this Agreement, by notifying the breaching party of such termination by letter, facsimile, telephone call, in person, email, or other reasonable means by any officer or agent. For abundance of clarity, email is an acceptable method of providing notice for termination. However, an email shall only be deemed received once it has been responded to or for which a read receipt is received.

**7. Amendment,** This Agreement may only be amended by the written consent of both parties. However, unless explicitly prohibited in an IO(s), the types and pricing of leads and/or calls purchased by QUOTESTORM may be modified by email. An email shall only be deemed received once it has been responded to affirmatively.

**8. DISCLAIMERS AND LIMITATIONS OF LIABILITY.** BOTH PARTIES UNDERSTAND AND AGREE THAT COMPANY IS PROVIDING LEADS FOR THE USE OF QUOTESTORM AND ITS DOWNSTREAM PARTNERS AND EMPLOYEES. UNDER NO CIRCUMSTANCES AND UNDER NO LEGAL THEORY, WHETHER IN TORT (INCLUDING NEGLIGENCE), CONTRACT, OR OTHERWISE, SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY PERSON FOR ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES OF ANY CHARACTER INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF GOODWILL, WORK STOPPAGE, COMPUTER OR EQUIPMENT FAILURE OR MALFUNCTION, OR ANY AND ALL OTHER COMMERCIAL DAMAGES OR LOSSES.

**9. Warranty.**
    A. Each Party represents and warrants that it has the right, power, and authority to enter into this Agreement, to become a Party hereto and to perform its obligations hereunder. This Agreement is a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms.
    B. Each Party represents and warrants that it will comply with the terms of this Agreement.
    C. Each Party represents and warrants that it will comply with Applicable Laws, Rules, and



Regulations.

D. COMPANY represents and warrants to QUOTESTORM that for all lead-based engagements, all leads will have consent language and shall comply in all material respects with applicable provisions of the TCPA and all other Applicable Laws, Rules, and Regulations. Further, all consent language will obtain consent for all of the following: (i) consent for to receive autodialed calls, (ii) consent to receive prerecorded telemarketing calls, and (iii) consent to receive texts/SMS. Furthermore, COMPANY represents and warrants to QUOTESTORM that QUOTESTORM, its Downstream Partners, and/or Affiliates may call and text/SMS any telephone or mobile phone numbers contained within Lead Data for the purpose of providing insurance quotes or connecting the individual with insurance agents or carriers, including but not limited to through the use of an automatic telephone dialing system and pre-recorded voice, and Company agrees to provide to QUOTESTORM, upon request (including via electronic mail) from QUOTESTORM, proof of such prior express written consent for all Lead Data provided to QUOTESTORM, which proof will include, in addition to all other information or evidence reasonably requested by QUOTESTORM, screenshots of the notification and consent language appearing on sources from which Lead Data was collected, the IP address of the source of the Lead Data, and the date and time stamp indicating the time the Lead Data was collected. Proof of prior express written consent will include an agreement, in writing, bearing the signature of the person in writing (which may be electronic as permitted by law) that clearly authorizes QUOTESTORM, its Downstream Partners, and/or Affiliates to deliver or cause to be delivered to the individual advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice and any text/SMS, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered. Proof of prior express written consent also will include a clear and conspicuous disclosure advising the person signing that: (a) by executing such agreement, such person authorizes QUOTESTORM, its Downstream Partners, and/or Affiliates to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice and any text/SMS; and (b) the person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services.

E. COMPANY represents and warrants to QUOTESTORM that for all call engagements, any related leads were collected in such a way that they have consent language and comply in all material respects with applicable provisions of the TCPA and all other Applicable Laws, Rules, and Regulations. Further, any calls, SMS, texts, and any other related technology used to generate the call will further comply with all Applicable Laws, Rules, and Regulations, including, but not limited to, being TCPA compliant.

F. COMPANY represents and warrants to QUOTESTORM that all leads and calls provided to QUOTESTORM have been lawfully collected and compiled and do not violate the rights of any third parties

G. COMPANY represents and warrants to QUOTESTORM that leads and/or calls were collected from or utilized Materials and Sites that do not infringe, violate, or misappropriate any intellectual property rights of any third party or contain Prohibited Content

H. QUOTESTORM shall provide COMPANY with the accurate name or content to be inserted into the consent language and accurate information with respect to its call and other communication practices. If applicable, QUOTESTORM shall contact the Leads in accordance with the consents obtained.

I. QUOTESTORM similarly offers the representations and warranties in Section 9, paragraphs (d) through (h) above to Company, only if QUOTESTORM provides any of these services.



**10. DISCLAIMER OF WARRANTIES.** EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT, NEITHER PARTY MAKES ANY, AND EACH DISCLAIMS ALL, REPRESENTATIONS AND WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, WITH RESPECT TO THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, WARRANTIES OF FITNESS, MERCHANTABILITY, NON-INFRINGEMENT, OR ANY IMPLIED WARRANTIES ARISING OUT OF A COURSE OF PERFORMANCE, DEALING, OR TRADE USAGE). IN ADDITION, NEITHER PARTY MAKES ANY REPRESENTATION THAT THE OPERATION OF ITS WEBSITE(S) AND/OR SERVICE(S) WILL BE UNINTERRUPTED OR ERROR FREE, AND NEITHER PARTY WILL BE LIABLE FOR THE CONSEQUENCES OF ANY INTERRUPTIONS OR ERRORS.

**11. Indemnification.** Each Party agrees to indemnify, defend and hold harmless the other Party, its Affiliates, and its Downstream Partners, and each of their officers, shareholders, directors, employees and agents (collectively, the "Indemnified Parties"), from and against any and all third party claims, demands, proceedings, suits and actions, including any related liabilities, obligations, losses, damages, fines, judgments, settlements, charges, expenses (including attorneys' and accountants' fees and disbursements) and costs ("Claims"), incurred by, borne by or asserted against any of the Indemnified Parties to the extent such Claims relate to, arise out of or result from: (i) any actions by indemnifying party or any employee, agent, or subcontractor thereof, which said conduct is intentional, negligent or otherwise; (ii) breach of any representation, warranty or covenant of indemnifying party contained herein; (iii) either Party's use of other Party's services contemplated hereunder; (iv) indemnifying party's violation of any Applicable Laws, Rules, and Regulations

**12. Do Not Call / Unsubscribe Requests.** Should a prospect from a lead and/or call communicate to either Party a desire to be placed on a party's Do Not Call and/or unsubscribe list, such Party shall take commercially reasonable steps to add the Lead to such lists as outlined by law or as is generally done within the industry. In no case, shall a prospect from a lead and/or call's do not call or unsubscribe request be ignored. As it pertains to leads or calls sold from COMPANY to QUOTESTORM, all such requests will be shared with the other party.

**13. Authorized Users.** QUOTESTORM hereby authorizes COMPANY to treat those authorized users listed in the IO as an agent of QUOTESTORM and to share information with such authorized users. In the event that QUOTESTORM desires to remove an authorized user, QUOTESTORM must request updated IO(s) from COMPANY. QUOTESTORM agrees and acknowledges that COMPANY shall have no liability to QUOTESTORM in any way for sharing information with a previously approved authorized user unless a new IO(s) has been signed by both parties without that user listed. COMPANY shall not unreasonably withhold its signature from such an updated IO and will work to sign and approve as quickly as is commercially practicable.

**14. Insurance.** While this Agreement is in effect and for a period of one year thereafter, each party shall obtain and maintain, at its own cost and expense, insurance as set forth below. Such insurance shall be written by an insurance company or companies having an A.M. Best rating of at least A-. All per occurrence and aggregate amounts are minimums and may be exceeded.

    A. Commercial general liability insurance in an amount of $1 million per occurrence and $2 million in the aggregate, which insurance includes personal injury, property damage, and completed operations liability.

Doc ID: bc06ff1ef94b8c50ebd82482a29aa2717080fb19



B. Errors and omissions insurance (also known as professional liability insurance) in an amount of $1 million per occurrence and in the aggregate.

C. Cyber liability insurance in the amount of $1 million.

Each Party shall furnish the other party with satisfactory proof of such insurance upon request, in the form of certificates of insurance.

## 15. Miscellaneous

A. **No waiver.** No waiver by either party, whether expressed or implied, of any provision of this Agreement or of any breach or default of any party, shall constitute a continuing waiver of such provision or any other provisions of this Agreement, and no such waiver by any party shall prevent such party from acting upon the same or any subsequent default of any other part of any provisions of this Agreement.

B. **Governing Law, Venue, and Attorneys' Fees.** This Agreement shall be governed by the laws of the State Delaware. Should any legal action arise from this Agreement, including the enforcement of any conditions or covenants hereof, both COMPANY and QUOTESTORM consent to arbitration in accordance with the Expedited Procedures of the American Arbitration Association (Rules E1-E10). and that in the event that either Party is the losing party, the losing party shall pay all expenses incurred by the winning party as a result of such legal action, including reasonable attorneys' fees.

C. **Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties and their successors and assigns. Neither the Company nor the Buyer shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other (other than by merger or acquisition). Such written consent shall not be unreasonably withheld.

D. **Entire Agreement.** This Agreement is the entire agreement of the parties relating to the subject matter hereof, and supersedes all prior and contemporaneous negotiations, correspondence, understandings, and agreements of the parties relating to the subject matter hereof. COMPANY and QUOTESTORM have executed this Agreement to be effective as of the Effective Date.

E. **IO.** This MSA shall be deemed incorporated by reference into any insertion order (the "IO") entered by the COMPANY and QUOTESTORM and shall govern all subsequent IOs. Should terms and conditions of any IO subsequent to this agreement contradict those of this agreement, the terms and conditions of that IO shall supersede this agreement.

F. **Public Statements.** Neither Party shall make any public statements (including any press releases) referencing the other Party without prior written consent of the other Party. Neither Party nor any affiliated entity, will directly or indirectly, take any action that is intended, or would reasonably be expected, to disparage or harm the reputation or business of the other Party or any of its affiliates, directors, officers, agents or employees.

G. **Construction and Modification.** This Agreement is considered to have been drafted by both parties hereto such that the rule that ambiguities are construed against the drafter is not to be applied as against any party. Any modification or waiver of any of the terms hereof shall be effective only if made in writing and signed by both Parties.

H. **Exclusion of CISG.** The terms of the United Nations Convention on Contracts for the International Sale of Goods do not apply to this MSA.

I. **Severability.** In the event that any provision of this Agreement is found invalid or unenforceable pursuant to any judicial decree or decision, such provision shall be revised to reflect the intent of the Parties hereto to the maximum extent permitted by law or if such provision cannot be so revised, then such provision shall be severed from this Agreement and the remainder of this



Agreement shall remain valid and enforceable according to its terms.

J. **Relationship.** QUOTESTORM and COMPANY acknowledge that they are independent contractors. Nothing contained herein will create any partnership, joint venture, agency, franchise, sales representatives, or employment relationship between the Parties. Neither Party will have the authority to make or accept any offers or representations on the other Party's behalf.

K. **Force Majeure.** A Party shall not be considered to be in default or breach of this Agreement, and shall be excused from performance or liability for damages to the other Party, if and to the extent it shall be delayed in or prevented from performing or carrying out any of the provisions of this Agreement, arising out of or from any act, omission, or circumstance by or in consequence of any act of God, labor disturbance, sabotage, failure of contractors or suppliers of materials, act of the public enemy, war, invasion, insurrection, riot, fire, storm, flood, ice, earthquake, explosion, epidemic, breakage or accident to machinery or equipment or any other cause or causes beyond such Party's reasonable control, including any curtailment, order, regulation, or restriction imposed by governmental, military or lawfully established civilian authorities, or by making of repairs necessitated by an emergency circumstance not limited to those listed above upon the property or equipment of the Party or property or equipment of others which is deemed under the Operational Control of the Party. A Force Majeure event does not include an act of negligence or Intentional Wrongdoing by a Party. Any Party claiming a Force Majeure event shall use reasonable diligence to remove the condition that prevents performance and shall not be entitled to suspend performance of its obligations in any greater scope or for any longer duration than is required by the Force Majeure event. Each Party shall use its best efforts to mitigate the effects of such Force Majeure event, remedy its inability to perform, and resume full performance of its obligations hereunder. A Party suffering a Force Majeure event ("Affected Party") shall notify the other Party ("Non-Affected Party") in writing ("Notice of Force Majeure Event") as soon as reasonably practicable specifying the cause of the event, the scope of commitments under the Agreement affected by the event, and a good faith estimate of the time required to restore full performance. Except for those commitments identified in the Notice of Force Majeure Event, the Affected Party shall not be relieved of its responsibility to fully perform as to all other commitments in the Agreement. If the Force Majeure event continues for a period of more than 90 days from the date of the Notice of Force Majeure Event, the Non-Affected Party shall be entitled, at its sole discretion, to terminate the Agreement.

L. **Consumer Laws.** Both Parties agree and acknowledge that each must abide by all Federal and State Laws governing contacting consumers and leads, including but not limited to, Applicable Laws, Rules, and Regulations

M. **Survival.** All terms, conditions, obligations, and provisions capable of surviving the termination or expiration of this Agreement shall so survive.

N. **Headings.** The headings contained in this Agreement are for ease of reference only and are not and shall not be deemed to be substantive provisions of this Agreement.

O. **Counterparts.** This Agreement may be signed in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Signatures delivered electronically, including as a scanned pdf, shall have the same effect as original signatures.

P. **Signatory Authorization.** Each individual signing on behalf of a party hereto represents and warrants that he/she is duly authorized by such party to execute this Agreement on behalf of such party.

Q. **Interpretation.** For purposes of this MSA, the words "include," "includes," and "including" are deemed to be followed by the words "without limitation"; the word "or" is not exclusive; the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this MSA as a whole; words denoting the singular have a comparable meaning when used in the plural, and vice-versa; and words denoting any gender include all genders. Unless the context otherwise requires, references in this MSA to sections, exhibits, schedules, attachments, and appendices mean the sections of, and exhibits, schedules, attachments, and appendices attached to this MSA; references to any agreement, instrument, or other document means the agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and reference to a statute means the statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. The recitals, exhibits, schedules, attachments, and appendices referred to herein are an integral part of this MSA to the same extent as if they were set out verbatim herein. Unless otherwise specifically stated, the term "days" means calendar days.

R. **Notice and Service of Process.** Routine notices for the day-to-day management of the relationship contemplated by this Agreement may be given by email or such other method as the Parties may from time to time decide. Non-routine notices, including notice of termination, default, request for indemnification, assignment and other extraordinary matters, shall be in writing, shall be deemed effective upon receipt or failure to accept delivery, and shall be sent by personal delivery, overnight delivery service or certified mail, return receipt requested. Non routine notices shall be sent as set forth below or to such other address as a Party may from time to time designate in accordance with the procedures for non-routine notices in this paragraph. Non-routine notices sent to QUOTESTORM shall be directed to the attention of JC Redero, Quote Storm, 8500 SW 46th St. Miami, FL 33155, jcr@quotestorm.co. All non-routine notices sent to QUOTESTORM must include a copy via electronic mail to george@quotestorm.com and jennifer@quotestorm.com. Non-routine notices sent to COMPANY shall be directed to the attention of es@leadnomics.com and include a copy via electronic mail to matt@leadnomics.com.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date set forth below.

Title

01/05/2023

_____
Date
**COMPANY**

_____
Signature

Erick Sawby

**Quote Storm Holdings, LLC**

*George J Hurley*
_____
Signature

George Hurley

_____
Name

_____
Name

COO

_____
Title

**Dropbox** Sign                                    **Audit trail**

| | |
|---|---|
| **Title** | QuoteStorm MSA |
| **File name** | QuoteStorm-Afflue...copy-01-05-23.pdf |
| **Document ID** | bc06ff1ef94b8c50ebd82482a29aa2717080fb19 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

**SENT**
01 / 05 / 2023
21:04:16 UTC

Sent for signature to George Hurley (george@quotestorm.com) and Erick Sawby (es@leadnomics.com) from matt@leadnomics.com
IP: 66.191.29.207

**VIEWED**
01 / 05 / 2023
21:54:47 UTC

Viewed by George Hurley (george@quotestorm.com)
IP: 96.8.248.114

**SIGNED**
01 / 05 / 2023
21:57:44 UTC

Signed by George Hurley (george@quotestorm.com)
IP: 96.8.248.114

**VIEWED**
01 / 05 / 2023
22:10:13 UTC

Viewed by Erick Sawby (es@leadnomics.com)
IP: 107.10.233.120

**SIGNED**
01 / 05 / 2023
22:10:48 UTC

Signed by Erick Sawby (es@leadnomics.com)
IP: 107.10.233.120

**COMPLETED**
01 / 05 / 2023
22:10:48 UTC

The document has been completed.

Powered by **Dropbox** Sign

**DocuSign**

## Certificate Of Completion

Envelope Id: 626573A0990247148C85A2415A77135B
Status: Completed
Subject: Complete with DocuSign: Employment Agreement - Quote Storm Holdings LLC (P COOK)_(CM revised 12...
Source Envelope:

| | | |
|---|---|---|
| Document Pages: 10 | Signatures: 2 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | Quote Storm |
| AutoNav: Enabled | | 8500 SW 46 Street |
| EnvelopeId Stamping: Enabled | | nil |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | Miami, FL  33155 |
| | | QuoteStorm@gmail.com |
| | | IP Address: 24.189.116.141 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Quote Storm | Location: DocuSign |
|     12/19/2022 6:29:47 AM | QuoteStorm@gmail.com | |

## Signer Events

| Signer Events | Signature | Timestamp |
|---|---|---|
| Patrick Cook<br>Pjcooks330@gmail.com<br>Security Level: Email, Account Authentication (None) | *Patrick Cook*<br>—DocuSigned by:<br>E89290CD1A604F6...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 98.149.238.48 | Sent: 12/19/2022 6:32:43 AM<br>Viewed: 12/19/2022 8:14:55 AM<br>Signed: 12/19/2022 8:35:15 AM |
| **Electronic Record and Signature Disclosure:**<br>   Accepted: 12/19/2022 8:14:55 AM<br>   ID: 5c364ea8-5af2-411c-8c18-cecebc0c6deb | | |
| JC Redero<br>jcr@quotestorm.com<br>Founder<br>QuoteStorm<br>Security Level: Email, Account Authentication (None) | *JC Redero*<br>—DocuSigned by:<br>0E785D1931F34BE...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 73.0.83.230 | Sent: 12/19/2022 8:35:17 AM<br>Viewed: 12/20/2022 4:14:20 PM<br>Signed: 12/20/2022 4:14:30 PM |
| **Electronic Record and Signature Disclosure:**<br>   Accepted: 11/30/2020 8:41:58 AM<br>   ID: 01f95134-7fe7-4374-bd4b-0589cca2d079 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 12/19/2022 6:32:43 AM |

| Envelope Summary Events | Status | Timestamps |
| --- | --- | --- |
| Certified Delivered | Security Checked | 12/20/2022 4:14:20 PM |
| Signing Complete | Security Checked | 12/20/2022 4:14:30 PM |
| Completed | Security Checked | 12/20/2022 4:14:30 PM |

| Payment Events | Status | Timestamps |
| --- | --- | --- |

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 9/1/2020 3:09:20 PM
Parties agreed to: Patrick Cook, JC Redero

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, QuoteStorm (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

DocuSign Envelope ID: 626573A0-9902-4714-8C85-A2415A77135B

## EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") dated as of 12/19/2022 , 2022 (the "Effective Date") is made by and between QUOTE STORM HOLDINGS, LLC, a Delaware limited liability company (the "Company"), and Patrick Cook ("Employee").

## PRELIMINARY STATEMENTS

A.      Employee will commence is employment as the [VP of Partnerships] of the Company on January 2nd, 2023.

B.      The Company desires for Employee to continue to be employed as the [VP of Partnerships] of the Company, and Employee is willing to continue to be employed and commit himself to serve as the [VP of Partnerships] of the Company, subject to and on the terms and conditions set forth in this Agreement.

In consideration of the mutual acts and promises, covenants, agreements, representations, and warranties hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.      **Employment.**

(a)      Subject to the terms and conditions of this Agreement, the Company agrees to continue to employ Employee, and Employee hereby accepts and agrees to such continued employment, as [title] of the Company.  Employee shall report directly to the [President] of the Company (the "President").  Employee shall have such powers and duties with respect to the Company as may reasonably be assigned to Employee by the [President] from time to time, to the extent consistent with Employee's position.

(b)      Employee agrees to devote all of Employee's working time, attention and efforts to the Company and to perform the duties of Employee's position in furtherance of the interests of the Company.  During the Employment Period (as defined below), Employee shall not engage in any other business, employment, occupation or consulting activity for any direct or indirect remuneration or any other business activity which would necessitate Employee giving any disproportionate time or effort to such activity or would otherwise materially interfere with Employee's duties hereunder, without the prior written consent of the President.

2.      **Employment Period.** The term of this Agreement shall commence on the Effective Date and shall continue until terminated in accordance with the provisions of Section 6 of this Agreement ("Employment Period"). Employee understands and acknowledges that Employee's employment with the Company is for an unspecified duration and constitutes "at-will" employment. Employee understands that this Agreement does not form an express or implied contract of employment for any specified period of time.

3.      **Compensation; Benefits; Expenses.**

(a)      <u>Compensation.</u> The Company shall pay to Employee an annual base salary

131487522.1

1



EXHIBIT

B

DocuSign Envelope ID: 626573A0-9902-4714-8C85-A2415A77135B

of $150,000.00 (the "Base Salary") in accordance with the terms of this Section 3(a). The Base Salary shall be payable in equal installments commencing on such date as the parties shall mutually agree (which date shall be subsequent to the Effective Date) and, thereafter, during the Employment Period in accordance with the Company's customary payroll practice as in effect from time to time. Notwithstanding the foregoing, at the end of the 3-month period following the Effective Date, the parties will in good faith negotiate and agree upon a new commission compensation structure for Employee. The parties shall enter into an amendment to this Agreement setting forth the mutually agreed upon compensation structure.

(b)      Bonus. For each calendar year during of the Employment Period, Employee shall be eligible to receive an annual bonus (the "Annual Bonus"). However, the decision to provide any Annual Bonus and the amount and terms of any Annual Bonus shall be in the sole and absolute discretion of the President.

(c)      Employee Benefits. During the Employment Period, Employee shall be entitled to participate in all employee benefit plans, practices, and programs maintained by the Company, as in effect from time to time (collectively, "Employee Benefit Plans"), to the extent consistent with applicable law and subject to the eligibility requirements and other terms of the applicable Employee Benefit Plans. The Company reserves the right to amend or terminate any Employee Benefit Plans at any time in its sole discretion, subject to the terms of such Employee Benefit Plan and applicable law.

(d)      Expenses. Upon the submission of proper substantiation by Employee, and subject to such rules and guidelines as the Company may from time to time adopt, the Company shall reimburse Employee for all reasonable business expenses actually paid or incurred by Employee during the Employment Period. Notwithstanding the foregoing, Employee shall not incur any expense exceeding $1,000 without the prior written consent of the Company's [President].

4.      **Representations, Warranties and Covenants.** Employee represents, warrants and covenants to the Company as follows:

(a)      Employee has the full right to enter into this Agreement and perform all duties hereunder, and has made no contract or other commitment in contravention of the terms hereof (including, without limitation, contracts or obligations respecting trade secrets or proprietary information or otherwise restricting competition or solicitation of employees or customers), or which would prevent Employee from using his best efforts in the performance of the duties hereunder.

(b)      Employee's execution of this Agreement and Employee's performance hereunder shall not constitute a breach of any contract, agreement or understanding, oral or written, to which Employee is a party or by which Employee is bound.

(c)      Employee declares that he has read and understands all the terms of this Agreement; that Employee has had ample opportunity to consult with independent counsel prior to the execution hereof and by his execution and delivery of this Agreement Employee shall be deemed to either have had such a review or to voluntarily waive such review; that no promise,

2

131487522.1

DocuSign Envelope ID: 626573A0-9902-4714-8C85-A2415A77135B

inducement, or agreement has been made except as expressly provided in this Agreement; that it contains the entire Agreement between the parties; and that he enters into this Agreement fully, voluntarily, knowingly and without coercion.

(d)    Employee covenants that he is, and will remain in full compliance with all applicable laws and regulations relating to the Company.

5.    **Covenants**.

(a)    Confidentiality.

(i)    Employee understands and acknowledges that during the course of his employment by the Company, Employee has occupied and will continue to occupy a position of trust and confidence and has access and will continue to have access to and learn about confidential and proprietary documents, materials, and other information, in tangible and intangible form, relating to the Company and its business and existing and prospective clients, suppliers, investors, Affiliates and other associated third parties. Employee further understands and acknowledges that this Confidential Information is specialized and unique in nature and the Company's ability to reserve it for the exclusive knowledge and use of the Company (and its Affiliates) is of great competitive importance and commercial value to the Company, and that improper use or disclosure of the Confidential Information by Employee will cause irreparable harm to the Company, for which remedies at law will not be adequate.

(ii)    As used herein, "Confidential Information" shall mean information about the Company or any of its business, subsidiaries or Affiliates, and its clients and customers, that is not generally known by the public or to Persons not employed or engaged by the Company or any of its subsidiaries or Affiliates and that was made known to or learned by Employee prior to or during the course of his employment by the Company or any of its subsidiaries or Affiliates and that would not be known to the public but for the direct or indirect actions of, or disclosures by, Employee. For purposes of this Agreement, Confidential Information includes, but is not limited to, all information in spoken, printed, electronic or any other form or medium, relating directly or indirectly to products and services being provided or developed by the Company (or its Affiliates), processes, data, records, ideas, concepts, technical know-how, proprietary knowledge, trade secrets, operational methods, client lists, vendor information, advertising and marketing strategies and information, product development techniques, plans, cost information, financial information, pricing information, and compilation of information and records and also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable Person to be confidential or proprietary in the context and circumstances in which the information is known or used. Employee agrees to immediately deliver or return to the Company, at the Company's request at any time or upon termination of Employee's employment or as soon thereafter as possible, all written material containing Confidential Information as well as all documents, computer storage devices, records, lists, data, drawings, prints, notes and written information (and all copies thereof) furnished by the Company and its respective subsidiaries or Affiliates or prepared by Employee in the course of Employee's employment by the Company and its subsidiaries or Affiliates. Notwithstanding the foregoing, "Confidential Information" shall not include information that (a) is generally known to the public at the time of disclosure or becomes generally known without any breach of this

3

131487522.1

DocuSign Envelope ID: 626573A0-9902-4714-8C85-A2415A77135B

Agreement by Employee; (b) is known to Employee or in Employee's possession prior to the Effective Date as shown by Employee's files and records as of the date of the disclosure by the Company to Employee; (c) becomes known to Employee through disclosure by sources other than the Company or its employees or agents having the legal right to disclose such information who Employee did not reasonably believe to be bound by a confidentiality agreement with the Company or to otherwise be under an obligation to the Company not to disclose the Confidential Information; or (d) is independently developed by Employee without reference to or reliance upon the Confidential Information as shown by Employee's files and records as of the date of the disclosure by the Company to Employee.

(iii)    During the Employment Period and at all times thereafter (regardless of the reason of the termination of this Agreement), Employee shall not, except as may be required to perform Employee's duties hereunder or as required by legal process (provided that if Employee receives legal process with regard to disclosure of such Confidential Information, Employee shall promptly notify the Company and, at the Company's cost and expense, reasonably cooperate with the Company in seeking a protective order with respect to such Confidential Information), disclose the Confidential Information, without limitation in time or until such information shall have become public other than by Employee's unauthorized disclosure, disclose to others or use, whether directly or indirectly, any Confidential Information regarding the Company or any of its subsidiaries or Affiliates.

(b)    Non-Competition. Employee acknowledges and agrees that the existing or contemplated businesses (collectively, the "Business") of the Company and its subsidiaries and Affiliates may be conducted throughout the world. During Employee's employment with the Company and for a period of 24 months thereafter (the "Restricted Period"), Employee shall not directly or indirectly, on behalf of Employee or on behalf of or with any other Person, without the Company's prior written consent, work for in any capacity, or become employed by a competitor of the Company or participate in any business or other endeavor that is in competition with the Business. As used herein, "participate" means lending one's name to, acting as consultant or advisor to, being employed by or acquiring any direct or indirect interest in any business or enterprise, whether as a stockholder, partner, member, officer, director, employee, consultant or otherwise. Notwithstanding anything else contained in this Section, Employee may own, for investment purposes only, up to five percent (5%) of the stock of any competing company if it is a publicly-held corporation whose stock is either listed on a national stock exchange or on the NASDAQ National Market System and if Employee is not otherwise affiliated with or participating in such corporation. Notwithstanding the foregoing, if Employee's employment with the Company is terminated by the Company without cause, the non-competition covenant set forth in this Section 5(b) will automatically expire upon the effective date of such termination and will not apply to any post-termination period. For purposes of this Agreement, "cause" shall mean: (i) Employee's continued breach of, or willful refusal to materially perform his duties hereunder with reasonable diligence; (ii) Employee's intentional misrepresentation, reckless or grossly negligent act or willful misconduct; (iii) Employee's commission of any act involving fraud, personal dishonesty, embezzlement, or theft against the property or personnel of the Company; or (iv) Employee is convicted of or enters a plea of nolo contendere to a felony or other crime involving fraud or moral turpitude. The foregoing shall not affect either party's right to terminate this Agreement at any time pursuant to Section 6(a) below.

4

131487522.1

DocuSign Envelope ID: 626573A0-9902-4714-8C85-A2415A77135B

(c)     <u>Non-Solicitation of Clients.</u>  Employee recognizes that Employee will possess Confidential Information about the clients of the Company and its subsidiaries or Affiliates which is of substantial value to the Company and its subsidiaries or Affiliates in developing their respective businesses and in securing and retaining clients, and will be acquired by Employee because of Employee's business position with the Company.  Employee agrees that, during the Employment Period and the Restricted Period thereafter, Employee will not, directly or indirectly, either (i) solicit, induce, divert or take away, or attempt to solicit, induce, divert or take away, the business of any Restricted Client (as defined herein) for any product or service of the Business, (ii) attempt or seek to cause any Restricted Client to refrain, in any respect, from acquiring from or through the Company (or any Affiliate of the Company) any product or service of the Business, or (iii) induce or attempt to induce any Restricted Client to end its relationship with the Company for any reason whatsoever.  As used herein, "Restricted Client" means any Person to whom or to which products or services were provided by the Company (or any Affiliate of the Company), during the 12-month period prior to the date hereof, or at any time during the Employment Period or the Restricted Period, and any potential client of the Company (or any Affiliate of the Company) which was actively solicited during the 12-month period prior to the termination of Employee's employment.

(d)     <u>Non-Solicitation of Employees.</u>  Employee recognizes that Employee will possess Confidential Information about other employees of the Company and its subsidiaries or Affiliates relating to their education, experience, skills, abilities, compensation and benefits, and inter-personal relationships with suppliers to and customers of the Company and its subsidiaries or Affiliates.  Employee recognizes that the information he possesses and will possess about these other employees is not generally known, is of substantial value to the Company and its subsidiaries or Affiliates in developing their respective businesses and in securing and retaining clients, and will be acquired by Employee because of Employee's business position with the Company. Employee agrees that, during the Employment Period and the Restricted Period thereafter, Employee will not, directly or indirectly, (i) recruit any employee of the Company to discontinue his or her employment relationship with the Company, (ii) interfere with, disrupt, or attempt to disrupt any past or present relationship, contractual or otherwise, between the Company and the Company's employees, or (iii) solicit or recruit any employee of the Company or any of its subsidiaries or Affiliates for the purpose of being employed by Employee or by any business, individual, partnership, firm, corporation or other entity on whose behalf Employee is acting as an agent, representative or employee and that Employee will not convey any Confidential Information or trade secrets about other employees of the Company or any of its subsidiaries or Affiliates to any other Person except within the scope of Employee's duties hereunder.

(e)     <u>Proprietary Rights; Assignment.</u>  Employee agrees that all Developments (as defined below) made or conceived by Employee during the Employment Period shall be made for hire by Employee for the Company or any of its subsidiaries or Affiliates.  "Developments" means any idea, discovery, invention, design, method, technique, improvement, enhancement, development, computer program, machine, algorithm or other work of authorship that (i) relates to the Business or operations of the Company or any of its subsidiaries or Affiliates (regardless of when or where such Developments are prepared or whose equipment or other resources is used in preparing the same), or (ii) results from or is suggested by any undertaking assigned to Employee or work performed by Employee for or on behalf of the Company or any of its subsidiaries or Affiliates, whether created alone or with others, during or after working hours.  Developments

5

DocuSign Envelope ID: 626573A0-9902-4714-8C85-A2415A77135B

shall also include all printed, physical and electronic copies, all improvements, rights and claims related to the foregoing, and other tangible embodiments thereof, as well as any and all rights in and to copyrights, trade secrets, trademarks (and related goodwill), mask works, patents and other intellectual property rights therein arising in any jurisdiction throughout the world, including all pending and future applications and registrations therefor and renewals thereof. Employee shall promptly disclose in writing to the Company all Developments which may be conceived, made or acquired by Employee. All Confidential Information and all Developments shall remain the sole and exclusive property of the Company or its subsidiaries or Affiliates, as applicable. Employee shall acquire no proprietary interest or any intellectual property rights in any Confidential Information or Developments developed or acquired during the Employment Period. To the extent Employee may, by operation of law or otherwise, acquire any right, title or interest in or to any Confidential Information or Development, Employee hereby irrevocably assigns to the Company, for no additional consideration, all of Employee's right, title and interests in and to all Confidential Information, Developments and related proprietary rights therein, including the right to sue, counterclaim and recover for all past, present and future infringement, misappropriation or dilution thereof, and all rights corresponding thereto throughout the world. Employee shall, both during and after the Employment Period, upon the Company's request, promptly execute and deliver to the Company all such assignments, certificates and instruments, and shall, at the Company's cost and expense, promptly perform such other acts, as the Company may from time to time in its reasonable discretion deem necessary or desirable to evidence, establish, maintain, perfect, enforce or defend the Company's rights in Confidential Information and Developments.

(f)     Reasonable Restrictions.   The parties acknowledge and agree that the covenants and restrictions set forth in this Section 5 of this Agreement are reasonable for purposes of protecting the value of the business, goodwill and the legitimate business interests of the Company. It is the desire and intent of the parties that the provisions of this Section 5 be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. Employee further acknowledges and confirms that the restrictions contained herein (including without limitation the geographic scope and length of the term of the provisions of the restrictive covenant) are not overbroad, overlong, or unfair and are not the result of overreaching, duress or coercion of any kind. Employee further acknowledges and confirms that his full, uninhibited and faithful observance of each of the covenants contained herein will not cause him any undue hardship, financial or otherwise. Employee acknowledges and confirms that his special knowledge of the business of the Company is such as would cause the Company serious injury or loss if he were to use such ability and knowledge to the benefit of a competitor or were to compete with the Company in violation of the terms hereof. Employee further acknowledges that the restrictions contained herein are intended to be, and shall be, for the benefit of and shall be enforceable by, the Company's successors and assigns. If any particular provisions or portions of this Section 5 are adjudicated to be invalid or unenforceable, then such section will be deemed amended to delete such provision or portion adjudicated to be invalid or unenforceable; provided, however, that such amendments to apply only with respect to the operation of such section in the particular jurisdiction in which such adjudication is made.

(g)     Remedies for Breach. Employee expressly agrees and understands that the remedy at law for any breach by Employee of this Section 5 will be inadequate and that damages flowing from such breach are not usually susceptible to being measured in monetary terms. Accordingly, it is acknowledged that upon Employee's violation of any provision of this Section 5,

6

131487522.1

DocuSign Envelope ID: 626573A0-9902-4714-8C85-A2415A77135B

the Company shall be entitled to obtain from any court of competent jurisdiction immediate injunctive relief and obtain a temporary order restraining any threatened or further breach as well as an equitable accounting of all profits or benefits arising out of such violation. Nothing in this Section 5 shall be deemed to limit the Company' remedies at law or in equity for any breach by Employee of any of the provisions of this Section 5, which may be pursued by or available to the Company.

(h)    Survival of Provisions. The obligations contained in this Section 5 shall, to the extent provided in this Section 5, survive the termination or expiration of Employee's employment with the Company and, as applicable, shall be fully enforceable thereafter in accordance with the terms of this Agreement. If it is determined by a court of competent jurisdiction in any state that any restriction in this Section 5 is excessive in duration or scope or is unreasonable or unenforceable under the laws of that state, it is the intention of the parties that such restriction may be modified or amended by the court to render it enforceable to the maximum extent permitted by the law of that state.

6.    **Termination.**

(a)    Any party may terminate this Agreement at any time, with or without cause or for any or no cause, with or without notice.[1]

(b)    This Agreement shall also automatically terminate upon Employee's death or disability. As used herein, "disability" shall mean Employee's absence from the full-time performance of the duties for a period of three (3) consecutive months as a result of Employee's incapacity due to physical or mental illness.

(c)    Upon any termination pursuant to this Section 6, the Company shall only be obligated to pay to Employee (or his personal representative) any amounts of the Base Salary due under Section 3(a) hereof (or portion thereof) earned through the date of termination. The Company shall have no further liability hereunder (other than for reimbursement for reasonable business expenses incurred prior to the date of termination subject, however, to the provisions of Section 3(d)).

(d)    Upon termination of this Agreement, the parties expressly agree that all rights granted to Employee under or pursuant to this Agreement shall immediately cease.

7.    **Return of Property.** At the end of the Employment Period or at any time on the Company's request, Employee agrees to return to the Company, retaining no copies or notes, all documents relating to the Business including, but not limited to, Confidential Information (as defined in the Confidentiality Agreement), work product, reports, abstracts, lists, correspondence, information, computer files, computer disks, and all other materials and all copies of such material, obtained by Employee during his employment with the Company as well as any Company property (e.g., cellular phones, laptop computers, etc.) which may be in Employee's possession. The provisions of this Section 7 shall survive the expiration or termination of this Agreement.

---

[1] JC: do we want to require some prior notice, e.g., 30 days?

7

131487522.1

DocuSign Envelope ID: 626573A0-9902-4714-8C85-A2415A77135B

8. **Withholding.** The Company shall make such deductions and withhold such amounts from each payment and benefit made or provided to Employee hereunder, as may be required from time to time by applicable law, governmental regulation or order.

9. **Further Assurances.** Each party hereto shall cooperate and take such further action as may be reasonably requested by the other party in order to carry out the terms and purposes of this Agreement and any other transactions contemplated herein.

10. **Notice.** Any notice or other communication provided for herein or given hereunder to a party hereto shall be in writing and shall be given in person, by overnight courier, by mail (registered or certified mail, postage prepaid, return receipt requested) or sent by confirmed e-mail transmission to the respective party. Notices personally delivered, sent by overnight courier or sent by e-mail transmission shall be deemed given on the date of delivery and notices mailed in accordance with the foregoing shall be deemed given upon the earlier of receipt by the addressee, as evidenced by the return receipt thereof, or three (3) days after deposit in the U.S. mail. Notice shall be addressed to the parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10): (i) if to the Company, to its principal business address, and (ii) if to Employee, to the address set forth in the Company's records.

11. **Successors and Assigns.** This Agreement is personal in its nature and Employee shall not, without the consent of the Company, assign or transfer this Agreement or any rights or obligations hereunder. In the event of the merger, consolidation, transfer, or sale of all or substantially all of the assets of the Company with or to any other Person, this Agreement shall, subject to the provisions hereof, shall be binding upon and inure to the benefit of such successor and such successor shall discharge and perform all the promises, covenants, duties, and obligations of the Company hereunder, and all references herein to the "Company" shall refer to such successor.

12. **No Implied Waiver.** The failure of either party to insist on strict performance of any covenant or obligation under this Agreement, regardless of the length of time for which such failure continues, shall not be deemed a waiver of such party's right to demand strict compliance in the future. No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation under this Agreement shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation.

13. **Governing Law; Waiver of Jury Trial.** This Agreement shall be governed by the laws of the State of Florida without regard to its conflicts of laws principles. If litigation results from or arises out of this Agreement or the performance thereof, the parties agree to reimburse the prevailing party's reasonable attorneys' fees, court costs, and all other expenses, whether or not taxable by the court as costs, in addition to any other relief to which the prevailing party may be entitled. The parties agree to accept any service of process by mail and to the exclusive venue of the state and federal courts of competent jurisdiction located in Miami-Dade County, Florida in any dispute arising out of this Agreement or the employment by the Company of Employee, compensation or any damages in respect thereof. **EACH OF THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT ANY OF**

8

131487522.1

DocuSign Envelope ID: 626573A0-9902-4714-8C85-A2415A77135B

**THEM MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE COMPANY ENTERING INTO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR OUT OF THE EMPLOYMENT OF EMPLOYEE BY THE COMPANY, COMPENSATION OR ANY DAMAGES IN RESPECT THEREOF.**

14.     **Counterparts/Electronic Signatures.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. For purposes of this Agreement, use of a facsimile, e-mail, or other electronic medium shall have the same force and effect as an original signature.

15.     **Certain Definitions**. For purposes of this Agreement, (i) the term "Affiliate" means any Person (as hereinafter defined) that, directly or indirectly, controls, is controlled by, or is under common control with, such Person, and (ii) the term "Person" shall mean any individual, partnership, corporation, limited liability company, unincorporated organization, trust or joint venture, or a governmental agency or political subdivision thereof.

16.     **Severability.** Whenever possible, each provision of this Agreement, will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal, or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed, construed, and enforced in such jurisdiction as if such invalid, illegal, or unenforceable provisions had never been contained herein.

17.     **Entire Agreement.** This Agreement constitutes the final, complete, and exclusive statement of the understanding of the parties with respect to the subject matter hereof, and supersedes any and all other prior understandings, both written and oral, between the parties. This Agreement may not be changed orally but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification, extension, or discharge is sought.

18.     **Construction.** This Agreement has been fully reviewed and negotiated by the parties hereto and their respective counsel. Accordingly, this Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

19.     **Headings.** Headings in this Agreement are for convenience only and shall not be used to construe meaning or intent.

[Signatures on Following Page]

9

131487522.1

DocuSign Envelope ID: 626573A0-9902-4714-8C85-A2415A77135B

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

COMPANY:

QUOTE STORM HOLDINGS, LLC, a Delaware limited liability company

By: JC Redero
Name:
Title: Founder

EMPLOYEE:

Patrick Cook
Patrick Cook

10

131487522.1

|  | IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT OF FLORIDA, IN AND FOR MIAMI-DADE COUNTY, FLORIDA |
|---|---|

QUOTESTORM HOLDINGS, LLC, a
Delaware limited liability company,

CIVIL DIVISION

      Plaintiff,

CASE NO.

vs.

PATRICK COOK, an individual, and
AFFLUENT ADS, LLC, a New
Jersey limited liability company, d/b/a
LEADNOMICS,

      Defendants,

_____/

## PLAINTIFF'S REQUEST FOR PRODUCTION
## TO DEFENDANT, AFFLUENT ADS, LLC, A D/B/A  LEADNOMICS

The Defendant, **Affluent Ads, LLC, d/b/a  Leadnomics,** pursuant to Rule 1.350(a) of the

Florida Rules of Civil Procedure, is requested to make available to the Plaintiff, **Quotestorm**

**Holdings, LLC,** at the Law Office of Bales Sommers & Klein, P.A., One Biscayne Tower, 2 S.

Biscayne Boulevard, Suite 1881, Miami, Florida 33131, within the time period as prescribed by

1.350 of the Florida Rules of Civil Procedure, the originals for inspection and/or copying, or if the

originals are not in your possession, legible copies of the following documents, items, and things

numbered 1 through 21 described in the attached "**Schedule A"** as follows:

### DEFINITIONS

The definitions of certain words utilized throughout this set of requests to produce are set

forth as follows. Please utilize these definitions when preparing your response and producing

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

documents or other information in response to this set of requests to produce. This set of requests to produce shall be deemed continuing so as to require supplemental responses if the persons to whom this set of requests to produce are addressed obtain further information between the time the responses are served and the time of trial.

A. "**Document**" shall mean each and every written, recorded, or graphic matter of **any** kind, type, nature, or description that is or has been in your possession, custody, or control, or of which you have knowledge, including, but not limited to, computer files, computer database, computer printouts, correspondence, electronic mail, text messages, skype messages, SMS messages, slack messages, memoranda, minutes, agendas, tapes, stenographic or handwritten notes, written forms of any kind, charts, blueprints, drawings, specifications, diaries, letters, telegrams, photographs, minutes, contracts (including all exhibits thereto), agreements, reports, surveys, data compilations of any kind, teletypes, telexes, telegrams, facsimiles, invoices, order forms, checks, drafts, statements, receipts, credit memos, reports, summaries, books, ledgers, notebooks, schedules, transparencies, recordings, catalogs, advertisements, promotional materials, films, video tapes, audio tapes, brochures, pamphlets, transcripts, manuals, graphs, estimates, tabulations, logs, charts, books of account, financial statements, purchase orders, or any written or recorded materials of any other kind, however stored, recorded, produced, or reproduced, and also including, but not limited to, drafts or copies of any of the foregoing that contain any notes, comments, or markings of any kind not found on the original documents or that are not otherwise identical to the original documents. The term "document" shall include data stored, maintained or organized on computer or any other way electronically or magnetically.

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

B. The term **"all documents"** means every document or group of documents for communication as above defined known to you and every such document or communication which can be located or discovered by reasonably diligent efforts.

C.  The term **"communications"** means any oral or written statement, dialogue, colloquialism, discussion, conversation and agreement, including but not limited to emails and text messages of any kind from any application or platform.

D.  The term **"Plaintiff,"** and/or **"and/or "QuoteStorm"** shall mean the Plaintiff in this action, "**Quotestorm Holdings, LLC"**, and any employee, agent, or attorney for Centennial and any other person acting for or on behalf of Centennial, or under Centennial's authority and control.

E.  The terms **"You,"** and/or **"Your,"** and/or **"Yours"** and/or "**Leadnomics**" shall mean and/or refer to "**Affluent Ads, LLC**, d/b/a **Leadnomics,** a Defendant in this action, and shall include its employees, agents and all other persons acting or purporting to act on the party's behalf, including, but not limited to, any attorney, accountant, contractor, employee, or consultant affiliated with **Leadnomics**, and any person or entity acting or purporting to act on its behalf.

F.  The terms **"Cook"** shall mean and/or refer to the Defendant "**Patrick Cook,"** and any employee, agent, or attorney for **Patrick Cook**, and any other person acting for or on behalf of **Patrick Cook**, or under **Patrick Cook's** authority and control.

G. The term **"Employment Agreement"** shall mean and/or refer to the Employment Agreement attached as **Exhibit B** to the Plaintiff Complaint, which Employment Agreement was executed between **QuoteStorm** and **Patrick Cook** on or around December 19, 2022.

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

H.  "**Person**" shall mean any natural person or any corporation, partnership, associates, joint venture, firm, or other business enterprise or legal entity.

I.  "**Identify**" when used in reference to a "document" means to set forth following **information**:

a.   general description thereof (e.g., a letter, memorandum, report, etc.)

b.  A brief summary of its contents;

c.  The name and address of the custodian of the original;

d.  The name and address of the person(s) who drafted, prepared, compiled, and/or signed it; and

e.  Any other descriptive information necessary in order to adequately describe it in a subpoena duces tecum or a motion or request for production.

J.  To "**identify**" a "**person**" that is a business, organization, or group of persons or any reference to stating the "identity" of such "person" shall mean to state the full **name** of such business, organization, or group of persons, the form of the business, organization or group of persons (e.g., corporations, partnership, joint venture) and to "identify" a natural person who would have knowledge of the requested information.

K.  "**And**" as well as "**or**" as used herein shall be read and applied as though **interchangeable** and shall be construed either disjunctively or conjunctively so as to require the fullest and most complete disclosure of all required information and documents.

L.  As used herein, the singular and masculine form of noun and pronoun shall embrace, and be read and applied as, the plural or feminine or neuter, as circumstances may make appropriate.

## INSTRUCTIONS

A.  All defined terms shall have the same meaning whether in capital or lowercase letters.

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

B.  Any document as to which a claim of privilege or work product is or will be asserted should be identified by author, signatory, description (e.g., letter, memorandum, telex, recording, etc.), title (if any), dates, addresses (if any), general subject matter, present depository, and present custodian and a complete statement of the ground for the claim of privilege or work product should be set forth.

C.  If it is maintained that any document requested has been destroyed, set forth the contents of the documents, the date of such destruction, and the name of the person who authorized or directed such destruction.

D.  If any of the documents cannot be produced in full, produce them to the extent possible and specify the reasons for the inability to reproduce the remainder.

E.  In the event that any document and/or electronic data requested herein is not presently in your possession or subject to your control, please identify each person you have reason to believe had or has knowledge of its contents.

F.  Unless otherwise specified, the time period for this Request for Production of Documents shall be from January 1, 2023 to the present.

G.  This Request for Production of Documents is continuing in nature. If, after producing documents, you become aware of any further documents responsive to this Request for Production of Documents, you are required to produce such additional documents.

## PRIVILEGE

If you object to production of a document because of a privilege, you must nevertheless provide the following information pursuant to Fla. R. Civ. P. 1.280(b), unless divulging the

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

information would disclose the privileged information:

    i.    the nature of the privilege claimed (including work product);

    ii.    the date of the document or oral communication;

    iii.    if a document: its type (correspondence, memorandum, facsimile, etc.), custodian, location, and such other information sufficient to identify the documents for a subpoena duces tecum or a document request, including where appropriate to author, the addressee, and, if not apparent, the relationship between the author and addressee; and

    iv.    the general subject matter of the document.

## SCHEDULE "A"

## DOCUMENTS REQUESTED TO BE PRODUCED

1. All documents exchanged between You and Cook that refer or relate to any issue or allegation raised in the Complaint.

2. All communication exchanged between you Cook that refer or relate to any issue or allegation raised in the Complaint.

3. All documents exchanged between You and Eric Gilbert that refer or relate to any issue or allegation raised in the Complaint.

4. All communications exchanged between You and Eric Gilbert that refer or relate to any issue or allegation raised in the Complaint.

5. All documents exchanged between You and Advanced Client Solutions that refer or relate to any issue or allegation raised in the Complaint.

6. All communications exchanged between You and Advanced Client Solutions that refer or relate to any issue or allegation raised in the Complaint.

7. All agreements or contracts between You and Cook.

8. All documents that refer or relate to Your relationship with Cook.

9. All documents evidencing compensation paid to Cook.

10. All documents evidencing any work performed by Cook for or on behalf of Leadnomics.

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

11. All documents evidencing any lead/call sales made by Cook for or on behalf of Leadnomics.

12. All communications between You and Enhance Health.

13. All documents exchanged between You and Enhance Health.

14. All documents that refer or relate to the sale of calls/leads to Enhance Health or any other QuoteStorm client.

15. All documents that refer or relate to the sale of calls/leads to Insurance Line One or any other QuoteStorm client.

16. All communications between You and Insurance Line One.

17. All documents exchanged between You and Insurance Line One.

18. All documents that refer or relate to the sale of calls/leads to Jet Media.

19. All communications between You and Jet Media.

20. All documents exchanged between You and Jet Media.

21. All communications between You and Justin Marks that refer or relate to any issue or allegation raised in the Complaint.

22. All documents exchanged between You and Justin Marks that refer or relate to any issue or allegation raised in the Complaint.

23. All agreements or contracts between You and Justin Marks.

24. All documents evidencing compensation paid to Justin Marks.

25. All documents evidencing any work performed by Justin Marks for or on behalf of Leadnomics.

26. All documents exchanged between You and any person or entity that was a QuoteStorm client or vendor during the time of Cook's employment with QuoteStorm.

27. All communications between You and any person or entity that was a QuoteStorm client or vendor during the time of Cook's employment with QuoteStorm.

28. All documents that refer or relate to the Employment Agreement between Cook and QuoteStorm.

29. All communications between You and any person that refers or relates to the Employment Agreement between Cook and QuoteStorm.

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

30. All documents that refer or relate to the Employment Agreement between Justin Marks and QuoteStorm.

31. All communications between You and any person that refers or relates to the Employment Agreement between Justin Marks and QuoteStorm.

32. All documents which constitute QuoteStorm's Confidential Information as that term is defined in the Employment Agreement between Cook and QuoteStorm.

33. All documents evidencing the return of QuoteStorm's Confidential Information as that term is defined in the Employment Agreement between Cook and QuoteStorm.

34. All documents reflecting or evidencing sales made by You to Enhance Health, Jet Media, Insurance Line One or any other QuoteStorm client.

35. All communications between You and any third parties, regarding QuoteStorm's account and the services provided pursuant to the Master Services Agreement.

36. All records of any and all adjustments, modifications, changes or alterations made to QuoteStorm's account or service package, including but not limited to changes in the mix of services, the affiliates presented, the unique sub ID's, Pub ID's, product offerings or performance metrics.

37. All documents and electronic records relating to the performance of the services provided to QuoteStorm, including analytics, performance reports, call logs, traffic data, conversion rates, and any other metrics used to assess the performance of the services.

38. All internal documents, including meeting minutes, e-mails, texts or chats, memos or reports that discuss or relate to the service or product mix offered and/or provided to QuoteStorm.

39. All contracts, agreements, service level agreements, amendments, or any other written document that governs the relationship with QuoteStorm, including any terms and conditions, privacy policies, or other policy documents provided to QuoteStorm.

40. All marketing materials or advertising creatives matched to each sub ID that was passed along with the inbound calls or traffic sent, sales pitches, presentations or proposals made to QuoteStorm regarding the services provided by You, including material that outline the scope, performance and/or expectations of the services.

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

Jason Klein, Esq.
**BALES SOMMERS & KLEIN, P.A.**
*Counsel for the Plaintiff, Quotestorm*
*Holdings, LLC*
One Biscayne Tower
2 South Biscayne Blvd. Suite 1881
Miami, Florida 33131
Telephone: (305) 372-1200
Facsimile: (305) 372-9008
E-Mails: rbalesjr@bsklawyers.com
        jklein@bsklawyers.com

By: ___*/s/Jason Klein*_____
    Jason Klein, Esq.
    Florida Bar No.: 129097

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY on this 29th day of January, 2024, that a true and correct copy of the foregoing has been electronically filed using the Florida Courts E-Filing portal, and will be served via process server together with the Summons and the Plaintiff's Complaint upon the Defendant, Affluent Ads, LLC, a d/b/a Leadnomics.

_____*/s/Jason Klein*_____
    Jason Klein, Esq.

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

Filing # 190780381 E-Filed 01/29/2024 06:04:23 PM

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT OF
FLORIDA, IN AND FOR MIAMI-DADE
COUNTY, FLORIDA

QUOTESTORM HOLDINGS, LLC, a
Delaware limited liability company,

CIVIL DIVISION

CASE NO.

     Plaintiff,

vs.

PATRICK COOK, an individual, and
AFFLUENT ADS, LLC, a New
Jersey limited liability company, d/b/a
LEADNOMICS,

     Defendants,

_____/

## PLAINTIFF, QUOTESTORM HOLDINGS, LLC'S, NOTICE OF SERVICE OF FIRST SET OF INTERROGATORIES TO DEFENDANT AFFLUENT ADS, LLC D/B/A LEADNOMICS

The Plaintiff, **Quotestorm Holdings, LLC**, by and through its undersigned attorneys, gives notice of service of its First Set of Interrogatories to the Defendant, Patrick Cook, and request that the Defendant, **Affluent Ads, LLC d/b/a Leadnomics** answer, under oath, in writing and within the time allowed in accordance with Rule 1.340 of the Florida Rules of Civil Procedures the attached Interrogatories numbered 1 through 8.

Jason Klein, Esq.
**BALES SOMMERS & KLEIN, P.A.**
*Counsel for the Plaintiff, Quotestorm Holdings, LLC*
One Biscayne Tower
2 South Biscayne Blvd. Suite 1881
Miami, Florida 33131
Telephone: (305) 372-1200

Facsimile: (305) 372-9008
E-Mails: rbalesjr@bsklawyers.com
                jklein@bsklawyers.com


By:     */s/Jason Klein*
            Jason Klein, Esq.
            Florida Bar No.: 129097

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY on this 29th day of January, 2024, that a true and correct copy of the foregoing has been electronically filed using the Florida Courts E-Filing portal,  and will be served via process server together with the Summons and the Plaintiff's Complaint upon the Defendant, Affluent Ads, LLC d/b/a Leadnomics.

                        */s/Jason Klein*
                        Jason Klein, Esq.

**BALES SOMMERS & KLEIN, P.A.**
ONE BISCAYNE TOWER ♦ 2 SOUTH BISCAYNE BOULEVARD ♦ SUITE 1881 ♦ MIAMI, FLORIDA 33131
TELEPHONE (305) 372-1200 ♦ FACSIMILE (305) 372-9008

# *EXHIBIT "2"*

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

QUOTESTORM HOLDINGS, LLC, a
Delaware limited liability company,

Plaintiff,

vs.

PATRICK COOK, an individual, and
AFFLUENT ADS, LLC, a New
Jersey limited liability company, d/b/a
LEADNOMICS,

Defendants,
_____/

### DECLARATION OF STEPHEN GILL IN
### SUPPORT OF AFFLUENT ADS, LLC'S NOTICE OF REMOVAL

I, Stephen Gill, pursuant to 28 U.S.C. 1746, having personal knowledge of the matters

asserted herein, declare under penalty of perjury that the following is true and correct:

1.      I am over the age of 18, and I am making this affidavit based upon my own personal

knowledge.

2.      I am the sole member of Defendant, AFFLUENT ADS, LLC d/b/a LEADNOMICS

("Leadnomics").

3.      Leadnomics is a New Jersey limited liability company with its principal place of

business in Philadelphia, Pennsylvania, which is in the business of generating leads, sales and other

actions for their clients through affiliate marketing campaigns and programs.

4.      I am domiciled in, and am a citizen of, Puerto Rico.

5.      Although Leadnomics vehemently denies the allegations in Plaintiff's,

QUOTESTORM HOLDINGS, LLC ("QuoteStorm"), Complaint and denies QuoteStorm is

entitled to any of the relief requested, based on the nature of the relationships between the parties and value of the affiliate marketing campaigns such as those that were maintained by Enhance Health, Jet Media, and Insurance Line One, including number of leads purchased by these third parties, revenues, and profits at issue, the amount in controversy in dispute exceeds $75,000.00.

Stephen Gill

Dated: 2/21/24

2